UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| M.W. SULLIVAN, as Trustee for the Sullivan/Crosby Trust,<br><br>   Plaintiff,<br><br>v.<br><br>GENERAL STEEL DOMESTIC SALES, a Colorado limited liability company,<br><br>   Defendant. | 3:07-CV-00604-LRH-RAM<br><br>ORDER |

   Presently before the court is Defendant General Steel Domestic Sales, LLC's ("General Steel") Motion to Compel Arbitration or, in the Alternative, to Transfer Venue (#4[1]). Plaintiff M.W. Sullivan ("Sullivan"), as trustee for the Sullivan/Crosby trust, filed an opposition to this motion (#8) to which General Steel replied (#11).

**I.    Facts and Procedural History**

   The following facts are taken from Sullivan's[2] complaint.

   Plaintiff Sullivan is a trustee of the Sullivan/Crosby Trust. The trust owns a warehouse business in Richwood, Texas. Quinton Anderson represents the trust in Texas. In 2006, after the

---

[1]Refers to the court's docket

[2]All references to "Sullivan" are intended to portray M.W. Sullivan in his capacity as a trustee for the Sullivan/Crosby trust–the plaintiff in this case.

trust purchased additional land for its business, Sullivan and Anderson sought to find a turn-key contractor[3] to assist in their business's expansion by constructing additional buildings ("the Project"). On November 8, 2006, Steven Paige, an employee of Defendant General Steel, contacted Sullivan and told him that he could save money with General Steel by using its "direct through corporate package." After further discussions between the parties, Paige faxed Sullivan a "detailed plan and 'turn-key' contractor bid for construction of the [Project]." General Steel's bid listed a maximum cost of $1,760,630. However, Paige stated General Steel hoped to complete the Project at a cost slightly below one million dollars.

In the early evening of November 20th, General Steel faxed its "final agreements" ("the Contract") to Sullivan. However, page five of the Contract was missing, so Sullivan contacted Paige, who faxed Sullivan the missing page the following day. Sullivan reviewed the Contract and, pursuant to its instructions, faxed it to General Steel along with copy of a check for a $150,000 deposit. Tim Wright, a General Steel employee, received the fax and notified Sullivan that General Steel was ready to proceed with the Project pursuant to the Contract. Later, on the same day, Paige contacted Sullivan and stated that on November 28th, General Steel would provide a complete schedule for the shipments of construction materials to the Project's site. On November 27th, Sullivan mailed the check for $150,000 to General Steel.

On November 28th, Sullivan contacted Paige and was informed that General Steel received Sullivan's check and that Chris Hawthorne, General Steel's Project Coordinator, would contact Sullivan later that afternoon. Hawthorne, however, never contacted Sullivan. On December 5th, Sullivan received a phone call from woman claiming to be a General Steel employee. The woman promised to send detailed drawings of the Proejcts's buildings within one week. However, no one

---

[3]Sullivan defines a turn-key contractor as "a contractor that will provide all drawings, engineering, permits, supplies, demolition of the existing improvements, and everything else necessary for the operation to be prepared to open its business upon the contractor's successful completion of the project."

from General Steel contacted or communicated with Sullivan or Anderson for the rest of December 2006 and January 2007.

On February 2nd, Anderson informed Sullivan that he had spoken with Gary Wells, a General Steel contractor, who stated that General Steel failed to furnish any detailed construction plans to him. On February 7th, Anderson communicated with General Steel regarding their failure to furnish detailed plans to Wells. On February 19th, Erica Gonzales, a General Steel employee, promised to send finished drawings to Wells and Anderson; two days later, Anderson told Sullivan that he was working with Gonzales to obtain the drawings. However, on March 1st, Anderson told Sullivan that he had not heard from Gonzales or any employee from General Steel. On March 5th, a General Steel employee contacted Sullivan and promised that the drawings would be ready by the middle of the following week. Anderson continually attempted to contact General Steel with no response, and by April 4th, there were still no final drawings issued by General Steel.

On April 9th, Anderson received detailed construction plans for the Project. However, neither Sullivan nor Anderson received–or ever received–plans for the complete construction of the Project, which would have included site planning, drainage, parking, concrete, and lighting. On April 20th, Sullivan received three faxes from General Steel accusing Sullivan of failing to respond to any written requests, delaying delivery of General Steel's products, and thereby failing to fulfill his contractual obligations. General Steel thus claimed it was entitled to retain Sullivan's deposit and commence arbitration to recover additional damages. Sullivan, in response, called General Steel about the faxes. General Steel's Vice President, Jonah Goldman, returned Sullivan's call, apologized for the faxes, and advised Sullivan that the Project was in good standing but Sullivan would be subject to delay fees after three months.

By May 1st, Sullivan and Anderson had still not heard anything from General Steel regarding the Project's construction. On May 8th, Anderson insisted that Wells reply to either Sullivan or him by the following day. On May 9th, Wells contacted Anderson and stated that he

3

could not complete the Project for less than $5,390,000. Upon hearing this, Sullivan attempted to contact Hawthorne and Paige to ensure General Steel was aware of excess payments General Steel would be obligated to pay their contractor, Gary Wells, pursuant to the Contract. Paige told Sullivan that he clearly remembered Sullivan's maximum price was about one million dollars. Paige also stated that the matter would be resolved as soon as possible. By May 15th, however, neither Anderson nor Sullivan had heard anything from General Steel regarding Wells's $5,390,000 bid.

On May 16th, Hawthorne told Sullivan that one-third of Wells's $5,390,000 bid was devoted to costs required to clean off the Project's site. Sullivan asserts in his complaint that at that point he had already received a bid to clear off the Project's site for approximately $27,000. Sullivan told Hawthorne that he planned to have the site cleaned off for that amount due to General Steel's inactivity. Hawthorne later told Sullivan that Randy Donakowski, another General Steel contractor, would be contacted in an attempt to rectify the situation. However, even after numerous attempts to reach Hawthorne, neither Hawthorne, Donakowski, nor any other representative from General Steel contacted Sullivan or Anderson until June 21st.

On June 27th, Billy Burnham, a General Steel employee, contacted Sullivan and told him that he was trying to set up constructions plans with another contractor. The following day, Anderson told Sullivan that he spoke with Burnham and learned that the Project's plans were sent to another contractor. Burnham also told Anderson he should expect a response shortly.

Anderson tried numerous times to contact Burnham, but Anderson heard nothing from Burnham or General Steel until July 16th. At that time, Sullivan and Anderson discovered that General Steel was not a contractor, but rather General Steel is only a broker that purchases steel and resells it at double the cost. Anderson then contacted General Steel and demanded repayment of his $150,000 deposit. On July 24th, Anderson spoke with Bruce Graham, a General Steel manager. After hearing Anderson's complaint, Graham said that he would call Anderson in the middle of the following week and tell Anderson whether General Steel would perform the Contract or refund the

4

deposit. Graham never returned Anderson's call, and Sullivan nor Anderson had any communication with General Steel until August 7th, when Sullivan called General Steel and spoke with Graham. Graham told Sullivan that he would take immediate action to find a contractor at the bid price and begin performance on the Contract. Graham contacted Sullivan later that day and told Sullivan that he was soliciting low bids from contractors, one of which was Donakowski.

On September 10th, Anderson contacted Donakowski, who said that he had been out of the country until that time; however, Donakowski promised to submit a final bid as General Steel's contractor within a couple of days. On September 17th, Anderson spoke with Donakowski again and was told that Donakowski had bid $4,868,160 to construct the Project. On September 27th, Sullivan told Paige and Graham that because General Steel would not pay the three million dollar difference between General Steel's price and its contractor's price, General Steel should refund the $150,000 deposit. Sullivan was then told that another person at General Steel would have to be consulted, and Sullivan would be contacted after this consultation.

On October 1st, Graham contacted Sullivan and insisted on Sullivan accepting delivery of $495,000 worth of steel. Graham stated that regardless of how much more expensive General Steel's steel was than its competitors' prices, the Contract required Sullivan to purchase the $495,000 of steel. Sullivan replied that these were not the terms of the Contract and also that he signed the Contract based on false representations. Also, Sullivan asked whether General Steel would refund the $150,000 deposit. General Steel refused.

Sullivan subsequently filed suit in Nevada's Ninth Judicial District Court, alleging seven claims for relief: (1) deceptive trade practices under Nevada Revised Statues sections 41.600, 598.0915, and 598.0923; (2) fraud in the inducement; (3) fraudulent misrepresentation; (4) negligent misrepresentation; (5) breach of contract; (6) breach of the implied covenant of good faith and fair dealing; and (7) unjust enrichment. On December 11, 2007, General Steel removed the case to this court and filed the instant motion to compel arbitration or, in the alternative, transfer venue. In

response, Sullivan claims that the Contract's arbitration clause is unenforceable because he was fraudulently induced to initial it.

## II. Legal Standard

Because this court will grant General Steel's motion to compel arbitration and does not reach General Steel's alternative motion to transfer venue, the court will only set forth the standard for considering a motion to compel arbitration.

Under § 2 of the Federal Arbitration Act ("FAA"),

> [a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. It is a court's responsibility to determine the threshold question of arbitrability. *See Republic of Nicar. v. Standard Fruit Co.*, 937 F.2d 469, 471 (9th Cir. 1991).

"In analyzing whether an arbitration agreement is valid and enforceable, 'generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2.'" *Nagrampa v. Mailcoups, Inc.*, 469 F.3d 1257, 1268 (9th Cir. 2006) (*quoting Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). "Section 2, therefore, embodies a clear federal policy of requiring arbitration unless the agreement to arbitrate is not part of the contract evidencing interstate commerce or is revocable 'upon such grounds as exist at law or in equity for the revocation of any contract.'" *Standard Fruit Co.*, 937 F.2d at 475. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

6

## III. Discussion

### A. Arbitrability

In *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006), the Supreme Court considered an appeal from the Florida Supreme Court's decision that a defendant's motion to compel arbitration should have been denied. The plaintiff in *Buckeye* brought a class action alleging that the defendant was charging usurious interest rates under a "Deferred Deposit and Disclosure Agreement." *Id.* at 443. In considering the defendant's appeal, the Supreme Court found that challenges to the validity of arbitration agreements "upon such grounds as exist at law or in equity for the revocation of any contract" fall into two categories. *Id.* at 444. The first type "challenges specifically the validity of the agreement to arbitrate." *Id.* The second type "challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.,* the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Id.* After creating this dichotomy the Court recognized three important principles for deciding whether a dispute is arbitrable, two of which are relevant here: "First, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. Second, unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Id.* at 445-476.

In deciding that the case at hand was arbitrable, the *Buckeye* Court looked at the "crux of the complaint" to conclude that the plaintiffs' challenge to the Deferred Deposit and Disclosure Agreement was to the contract as a whole rather than specifically to its arbitration provisions. *See id.* at 444, 446. The Court therefore held that the contract's arbitration provisions were enforceable apart from the remainder of the contract, and the plaintiffs' claims should accordingly be considered by an arbitrator instead of a court. *Id.* at 446.

Taking into account the framework set forth in *Buckeye*, this court now turns to whether the present dispute is arbitrable. The court concludes that it is. Sullivan's strongest argument in

7

opposition to General Steel's motion is that General Steel represented to Sullivan that he needed to initial the "Conditions" section of the Contract (which contains the arbitration clause at issue) in order to secure a low price for the Project. Sullivan's agreement to arbitrate, he argues, was therefore fraudulently induced because at that time General Steel had not even received any bids from contractors to complete the Project. In support of this contention Sullivan submits his own declaration, which, in part, states the following:

> On November 21, 2006, Paige mentioned that in order to solidify the Agreement, I needed to sign the Agreement, initial the Conditions, and send the certified deposit check for one hundred and fifty thousand dollars ($150,000) immediately or General Steel would be unable to agree to the maximum price of $1,076,630.00. In response I signed and initialed the required documents and, within one hour and fifteen minutes, rushed to th local post office to mail the documents to General Steel.

(Decl. of Dr. M.W. Sullivan (#9), at ¶ 4.) The problem with Sullivan's argument, however, is that it makes no mention of the complaint filed in this case.

As stated above, the Supreme Court in *Buckeye* looked at the "crux of the complaint" to conclude that the plaintiff's challenge was to a contract as a whole rather than a challenge specifically to the contract's arbitration provision. The Ninth Circuit has since followed this approach to determining whether a case is arbitrable. *See Nagrampa*, 469 F.3d at 1270 ("Examining the '*crux of the complaint*' makes it abundantly clear that [plaintiff's] challenge goes specifically, and only, to the arbitration clause.") (emphasis added). Sullivan's complaint, however, makes no reference to the Contract's arbitration clause. As such, in accordance with Supreme Court and Ninth Circuit precedent, the court concludes Sullivan's challenge is to the Contract as a whole rather than a challenge specifically to the Contract's arbitration clause. This case is therefore arbitrable.

**B. The Proper Venue for Arbitration**

Although the point was not briefed by parties, the court recognizes there is a significant issue as to where, if anywhere, this court should compel arbitration. The source of this problem stems from inconsistent language within § 4 of the FAA, which states in relevant part:

8

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action . . . of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.

The difficulty with this section arises from its directive that "the court shall make an order directing the parties to proceed to arbitration *in accordance with the terms of the agreement*," while at the same time the section states that "[t]he hearing and proceedings, under such agreement, *shall be within the district in which the petition for an order directing such arbitration is filed*." 9 U.S.C. § 4 (emphasis added). Under the plain language of the FAA, then, a court is left in a quandary when a contract provides for arbitration in a location different from the district where a petition to compel arbitration was filed. Such is the case here, as General Steel moved for arbitration in the District of Nevada even though the Contract provides for arbitration in Colorado. (*See* Purchase Agreement (#8), Ex. A at 8.)

The Ninth Circuit first recognized § 4's inconsistency in the 1941 case *Continental Grain Co. v. Dant & Russell*, 118 F.2d 967 (9th Cir. 1941). In *Continental*, a defendant filed suit in Oregon to compel the plaintiff to arbitrate a charterparty dispute. *Id.* at 968. The arbitration agreement provided that if any dispute arose between the parties, they would arbitrate in New York. *Id.* After the United States District Court for the District of Oregon compelled arbitration in Oregon, the defendant appealed. *Id.* The Ninth Circuit recognized that § 4 provides that arbitration hearings and proceedings shall be within the district in which the petition to compel arbitration is filed. *Id.* However, the court affirmed the district court on the basis that "[the defendant] had invoked the jurisdiction of a court other than that having jurisdiction in New York to enforce the agreement. The [defendant] having invoked the jurisdiction of the United States District Court for

9

Oregon is hardly in a position to complain that it has exercised that jurisdiction in accordance with the statute giving it jurisdiction." *Id.* at 969.

In a more recent case, *Sovak v. Chugai Pharmaceutical Co.*, 280 F.3d 1266 (9th Cir. 2002), *amended by Sovak v. Chugai Pharmaceutical Co.*, 289 F.3d 615 (9th Cir. 2002), the Ninth Circuit identified the issue of whether a district court could compel arbitration outside of the district where a defendant moved to compel arbitration. The court stated that because the plaintiff failed to raise the issue in opposing the defendant's motion to compel arbitration, the court would not address whether the district court properly compelled arbitration outside its district. *Id.* at 615 n.1. However, the court compared *Continental Grain Co.* with the Fifth Circuit case *Dupuy-Busching General Agency, Inc. v. Ambassador Insurance Co.*, 524 F.2d 1275 (5th Cir. 1975) and noted that *Continental Grain* held that § 4 of the FAA "limits a court to ordering arbitration within the district in which the suit was filed," while *Dupuy-Busching* concluded that "§ 4 bars ordering arbitration in another judicial district only when the party seeking to compel arbitration filed the federal suit." *Id.* This court finds the Ninth Circuit's description of its own precedent significant because it implicitly recognizes the state of Ninth Circuit law with regard to whether a district court can compel arbitration outside of its district.[4]

Although *Sovak*'s statement regarding where a district court may compel arbitration was dictum, this court finds that *Sovak*'s interpretation of *Continental Grain* indicates how the Ninth Circuit would likely decide the issue. Therefore, because this court believes that, if presented squarely with the issue, the Ninth Circuit would require a district court to compel arbitration within its own district, this court will require the parties to arbitrate in Nevada. General Steel's motion to compel arbitration is therefore granted, and the parties are ordered to arbitrate the present

---

[4]The United States District Court for the Northern District of California has also found that *Continental Grain* requires a district court to compel arbitration in the district where a motion to compel arbitration was filed. *See Homestake Lead Co. of Mo. v. Doe Run Res. Corp.*, 282 F. Supp. 2d 1131, 1143-44 (N.D. Cal. 2003).

controversy in Nevada.[5]

IT IS THEREFORE ORDERED that Defendant's Motion to Compel Arbitration, or, in the Alternative, to Transfer Venue (#4) is GRANTED. The parties shall initiate arbitration in Nevada, and this court will stay this action in the interim.

IT IS SO ORDERED.

DATED this 11th day of June 2008.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

---

[5]The parties do not dispute whether the current dispute fulfills the FAA's requirements that (1) the Contract evidences a transaction involving commerce and (2) the present controversy falls within the Contract's arbitration clause. Nevertheless, the court concludes that the Contract evidences a transaction involving interstate commerce. The Contract provides that a Colorado company will provide a building in Texas. The Contract therefore evidences a transaction involving interstate commerce. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401 (1967).

Furthermore, the court concludes that the present dispute falls within the Contract's arbitration clause, which states that "[a]ny controversy or claim arising out of or relating to this contract, or the breach thereof, shall be resolved by arbitration . . . ." (Purchase Agreement (#8), Ex. A at 8.) Each of Sullivan's claims for relief centers upon General Steel's alleged misconduct in inducing Sullivan to enter the Contract (claims one through four), General Steel's breach of the Contract (claims five and six), or General Steel's failure to render services even though Sullivan paid it monies pursuant to the Contract (claim seven). These claims are susceptible of an interpretation that would allow arbitration. *See French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 784 F.2d 902, 908 (9th Cir. 1986). The court therefore concludes that the present controversy falls within the scope of the Contract's arbitration clause.